**COMMONWEALTH of Pennsylvania**

v.

**Michael Anson HARRELL, Appellant.**

Superior Court of Pennsylvania.

Submitted June 5, 2012.

Filed April 12, 2013.

Edward J. Rymsza, Williamsport, for Appellant.

Anthony J. Rosini, District Attorney, Sunbury, for Commonwealth, Appellee.

BEFORE: FORD ELLIOTT, P.J.E., DONOHUE and ALLEN, JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

Michael Anson Harrell appeals from the judgment of sentence of February 14, 2011, following his conviction of two counts of first degree murder and related offenses. We affirm.

The trial court has summarized the history of this case as follows:

At approximately 1:00 a.m. on January 18th, 2008, Amy Baney called 911 to report a shooting at the residence of 226 North Fourth Street. She identified the shooter as "Mike" on the phone. Two Sunbury police officers were dispatched

to the scene. The witness would again identify the shooter as "Mike" and told the officers he was a black male. The witness told police that "Mike" had used a "long gun; a rifle." She also informed the officers that he had fled the scene by running through the backyard.

Inside the home the officers discovered a haze in the air. The officers identified the haze as smoke and smelled gunpowder. Through the living room into the kitchen, the officers discovered the body of the first victim, David Moore. The black male was lying face down, motionless. The officers checked Mr. Moore for possible signs of life, however there were none. The officers then proceeded upstairs. At the far end of the upstairs hallway, the officers noticed a wedged door and a pool of blood creeping out from under the door. They entered the blocked room through a door in the closet of an adjacent room. They discovered a young female, Crystal Gordon, propped against the door. After checking her vitals, the officers determined there were no signs of life.

As they continued their sweep of the area, the officers discovered footprints in the light snow covering of the early morning. One of the officers is a trained K9 officer, and he had his dog, Rocky, with him in his cruiser. As other officers arrived on the scene, the K9 unit was taken to the footprints at the back of the house. As the dog picked up the scent, the tracking began. The dog tracked the footprints over a significant distance. The officers were reassured they were on the right track as they repeatedly took notice of footprints along the way which looked similar to those footprints at the crime scene. At the intersection of Race Street and Eighth Street, Rocky stopped tracking.

The Commonwealth concedes it does not know why the dog ceased tracking. Possible explanations included that the dog was tired, it expected a reward, the scent was faint or gone, or the track stopped.

The tracking officer called another Officer to the scene. This officer also had a K9 unit with him. Rocky was taken up Race Street. The new K9 unit proceeded down Eighth Street. For about half a block, the second K9 unit wandered from one side of the street to the other, presumably looking for a scent. Finally, the K9 put its head to the ground and began tracking, with the officers being drug [sic] along. The Officer testified that as the dog was tracking, he was looking for footprints, however the snow had long since melted in the center of the street. As the dog turned into an alley, footprints did appear in the snow. The escorting officer would testify that the footprints he observed in the alley way looked very similar to those at the crime scene.

The K9 unit continued to track until he got to Fairmount Avenue. There the dog traveled up the steps and onto the porch of the house at 19 Fairmount. The officers retreated with the dog, down the block to the parking lot of Alexander Motors. Other officers from throughout the area were then called to the scene. At about 2:30 a.m., an individual emerged from the house.

An officer on scene recognized the individual and identified him as Michael Harrell to the other officers. At that point, the officers approached, they instructed Mr. Harrell (hereafter Appellant) to get on the floor of the porch, and he complied. He was then taken into custody. At that point, a female [1] emerges from the dwelling and was tem-

1. Melissa Ranck.

porarily taken into custody. She was asked if anyone else is in the house. She responded that there are children in the house. The officers conducted a protective sweep of the house to ensure that no other individuals who might be armed and dangerous are in the house. They removed the children from their bedroom and collect[ed] them in the front room of the house, along with the female. Finding no one else, the officers remained on scene while application was made for search warrants for the house. While conducting the sweep, the officers noticed a large blue tub in the kitchen, and the stove with glowing elements. There appeared to be water in the tub along with a pair of black sweat pants.

Appellant, at this time, was in violation of his parole as both the Omnibus Hearing Testimony of Officer Hare and the evidence in the record shows. There was also testimony concerning his failure to appear at a scheduled hearing and a bench warrant being issued for his arrest as a result. The testimony included a conversation held between Appellant and Officer Hare concerning Appellant's decision to leave the state after his failure to appear.

As Appellant was being taken to Sunbury Police department, he made a statement to Officer Hare that all he had done was "break her f* * *ing jaw, and I'm in custody for that." He was then placed in the holding cell at Sunbury PD.

At the same time, the lead investigators in the case were dispatched to the crime scene where they interviewed the eye witness and thoroughly reviewed the crime scene.

Appellant was observed at various times throughout the morning lying down on the bench in the holding cell.

There was testimony that Appellant was provided a piece of pizza later in the day with a cup of water, but the pizza remained untouched. Appellant denies this event took place and maintains that he was denied a trip to the restroom and was ignored when asked what would happen to him.

From 8:30 a.m. to 9:44 a.m., the lead investigators were interviewing the eye witness to the murders in an attempt to settle some issues which had come to light from the information received from the witness. The investigators then decided to show the eye witness a photo lineup. A lineup was constructed, and consisted of eight photographs of eight black men. See Commonwealth's Exhibit # 148. The lineup was given to the witness at 9:44 a.m. Prior to receiving the lineup, the witness was instructed to pick out the person who shot David Moore and Crystal Gordon, if that person was present in the photo lineup. She was also instructed that if that person was not present in the lineup, that she should not pick someone out. The investigator looked at his watch after he handed her the lineup. His testimony is that it took Amy Baney exactly 12 seconds to identify the picture of the defendant in the lower left corner of the exhibit. That photograph was, in fact, a picture of the Appellant.

At approximately 10:35 a.m. the morning of January 18t, Appellant was taken into an interview room. The lead investigators identified themselves, showed Appellant their identification, and informed him they were investigating the murders of David Moore and Crystal Gordon. He was asked if he could read and write the English language, and Appellant acknowledged that he could.

The lead investigator, Corporal Bramhall, then placed the Miranda

Warning form in front of Appellant. *See* Commonwealth's exhibit # 276. Corporal Bramhall told the Appellant he was free to read along, and then the Corporal read aloud the rights and warning form to the Appellant. The Corporal would testify that it appeared to him that Appellant was reading along. Prior to giving the rights and warning form to Appellant, the Corporal filled out the particulars on the form, including Appellant's name, date of birth, the time and date, the location of the interview, and the Corporal's name. After reading the rights and warning portion of the Miranda Warnings, the waiver statement was read aloud to Appellant by Corporal Bramhall. When Appellant was asked if he understood those rights and the waiver, he acknowledged that he did. When Appellant was asked if he'd be willing to talk to the police, Appellant acknowledged that he would. He was asked if he had any questions, he indicated he did not. He was asked to sign the form, and he did. Then the interview commenced.

Appellant denied his involvement with the murders. Corporal Bramhall asked him then to recount his activities from the previous day, and Appellant complied. What is noteworthy about Appellant's recollection of his daily activities is that he includes specific times—down to the minute—that he conducted his normal activities. This was the narrative portion of the interview.

At approximately 12:30 p.m., Appellant was informed by Corporal Bramhall that they did not believe his account of his prior day's activities, and that they knew that he had killed both David and Crystal, they just didn't know why. *See* Omnibus Pretrial Transcript pg. 44. The officers had amassed a great deal of information from the eye witness to the murders and from the female living with Appellant at the residence on Fairmount Avenue. After being confronted with this information, Appellant admitted to the murders. He then gave the officers a statement. The Appellant indicated that he used a .30 caliber carbine, .30 caliber carbine rounds, and fifteen rounds were fired. Fifteen shell casings were recovered at the scene of the crime.

Following that, he was asked to give a written statement. He agreed and was given a written statement form. The officers then left the room and Appellant wrote for a short time. He then sat without writing for a time, then wrote again, and then sat again. He then ripped up the statement. The Corporal entered the room, recovered the ripped pieces of paper, and reconstructed them. *See* Commonwealth's Exhibit # 274. The statement reads, "I, Michael Harrell state the following: I went to Amy's house and was involved in an altercation with the deceased."

The officers asked Appellant to give another written statement. He complied and wrote "I will take the needle. I want to take the needle. Nothing is worse than this much grief or pain. I would like to take the time and get it over with at the earliest time, like tomorrow or right now," and initialed the document, M.H. The officer then wrote a question,

"Why do you want to take the needle?"

Appellant replied, "Maybe the next life will be better," and initialed again.

The officer wrote, "Did you kill someone today?"

Appellant replied, "Yes," and initialed.

The officer wrote, "Who did you kill?"

Appellant responded, "David and Crystal," and initialed.

The officer wrote, "How did you kill them?"

Appellant refused to answer. He was asked to give a taped statement and he refused.

As officers executed three warrants on the residence at Fairmount Avenue, they recovered several items of interest. A sneaker was recovered which belonged to the Appellant. The tread mark was analyzed and matched the tread mark in the footprints in the snow indicating defendant had, in fact, been at Amy Baney's house. DNA evidence was recovered from the bullet casings, though it was not a positive match it gave a percentage of exclusion with regard to the individuals in the population and the defendant. There was testimony that the DNA on the casings was consistent with the Appellant's DNA to the exclusion of over 90 percent of the population.

The Appellant and eye witness both gave accounts that other individuals were present at the crime scene. However, through police investigation, the presence of any of the individuals that either Appellant, or the eye witness indicated, was definitively ruled out—as there was testimony that each of the individuals were observed the night of the murder in another location.

While Appellant was housed at Northumberland County Prison, his girlfriend visited him. A prison guard, sitting eight feet away, testified that he heard Appellant admit the killings to his girlfriend. Another guard would testify that he heard the Appellant state that the Commonwealth would never find the murder weapon.

A forensic pathologist testified that David Moore had seven areas of gunshot wounds. He would also testify that Crystal Gordon had seven areas of gunshot wounds through her body. His opinion, to a reasonable degree of medical certainty, was that the bullet paths line up if Ms. Gordon was in a crouched position, with her hands over her head. This position is inconsistent with Appellant's contention during his oral statement to police that the victim was armed with knives when he shot her.

The eye witness gave several differing accounts of the events that transpired in the early morning of January 18th, 2008. Her accounts included various individuals being present, who were, in fact, not present. However, through all of her accounts, she consistently identified Appellant as the shooter.

Prior to trial, a Frye hearing was conducted to determine whether expert testimony would be allowed on the subject of false confessions. The Court held a two-day hearing and took testimony from "experts" in the field of false confessions and from others who refute the validity of such scientific endeavors. The Court determined that evidence of false confessions was not sufficient to pass the *Frye* standard and precluded the admission of such evidence at trial.

In addition, three search warrants were obtained throughout the course of the proceedings. Two of the search warrants signed by a magistrate, included D.N.A. samples from the Appellant; and a request for ammo, a laptop computer, and clothing items from the house on Fairmount Avenue. The third warrant covers the shoes the Appellant was wearing the on [sic] January 18th in the morning.

At trial, the Commonwealth requested at the conclusion of its case-in-chief to have any notes of interviews with defense witnesses turned over for use on cross-examination. Defense objected. This Court ruled that "any and all state-

ments of the defense witnesses taken by defense may be requested by the Commonwealth at the beginning of cross examination. Specifically in accordance with *Commonwealth v. Brinkley* and *Commonwealth v. Perez*, the statements are those statements that were signed, adopted, or otherwise shown to be substantial and/or verbatim statements of witnesses. The Commonwealth will need to elicit from each witness whether the witness provided any such statement to the defense. At that time the defense will provide all applicable statements to the Commonwealth, and the Commonwealth will be allowed and allotted sufficient time to review each such statement." *See* Trial Transcript Volume II pg. 964.

Following a ten-day trial, Appellant was found guilty on all counts and was later sentenced. This appeal follows.

Trial court opinion, 7/13/11 at 1–8.

On February 14, 2011, appellant received consecutive life sentences on the two counts of first degree murder. Appellant was also sentenced to six to 12 years' imprisonment for firearms not to be carried without a license, to be served consecutively to his life sentences. Two counts of aggravated assault merged for sentencing purposes. A timely notice of appeal was filed on March 9, 2011. Appellant timely complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court has filed an opinion.

Appellant has raised the following issues for this court's review:

I. Whether [appellant]'s due process rights were violated where the police failed to create a recording of his interrogation and alleged confession?

II. Whether the trial court erred in precluding the expert testimony at trial of Dr. Richard Ofshe on the influence of police interrogation and the phenomenon of false confessions?

III. Whether the trial court erred when it ordered unredacted disclosure of the defense investigator's reports from interviews of witnesses regarding subject matter beyond the scope for which the witness was being offered or questioned?

IV. Whether the trial court erred when it denied the motion to suppress [appellant]'s statements to the police where such statements were made involuntarily and without a knowing, willing and voluntary waiver of his *Miranda* rights?

V. Whether the trial court erred when it denied [appellant]'s motion to suppress physical evidence stemming from the search of his residence where the search warrants were defective and where the initial warrantless entry was not supported by probable cause or exigent circumstances?

VI. Whether the trial court erred when it denied the motion to suppress identification evidence where [appellant]'s right to counsel during the photographic lineup was violated?

Appellant's brief at 12.

In his first issue on appeal, appellant argues that his due process rights were violated by the failure to record his interrogation and confession. Appellant argues that the failure to record his interrogation deprived him of an opportunity to establish that his confession was involuntary and the product of police coercion. According to appellant, the police deliberately failed to record the interrogation so

that appellant would be unable to contest the voluntariness of his confession by examining the surrounding circumstances including the police tactics employed, the length of questioning, promises made, *etc.* (Appellant's brief at 24–25.)

In *Commonwealth v. Craft,* 447 Pa.Super. 371, 669 A.2d 394 (1995), this court held that custodial interrogations do not need to be recorded to satisfy the due process requirements of the Pennsylvania Constitution. *Id.* at 397.[2] The majority of states, with the exception of Alaska and Minnesota, have not adopted a rule requiring police to record interrogations. *Id.* at 396. Nor has the United States Supreme Court been asked to determine whether the United States Constitution requires the recording of custodial interrogations as a matter of federal due process. *Id.* This court determined that the Pennsylvania Constitution does not require contemporaneous recording of statements and that the adoption of a rule requiring contemporaneous recording of custodial interrogation should be left to the Pennsylvania Supreme Court or the General Assembly, not an intermediate appellate court. *Id.* at 398. Appellant's first claim fails.

■ Next, appellant contends that the trial court should have allowed his proposed expert, Dr. Richard Ofshe, to testify regarding the phenomenon of false confessions. According to appellant, Dr. Ofshe is a leading scholar on the issue of false confessions and related topics. (Appellant's brief at 30.) As stated above, appellant argued that his confession was coerced. Appellant wished to present Dr. Ofshe to educate the jury regarding false confessions, that false confessions exist, how to recognize them, and police interrogation techniques in general. (*Id.* at 31.) Following an extensive pre-trial hearing, the trial court denied appellant's motion to admit Dr. Ofshe's testimony on the basis that it failed to meet the standard for admissibility set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923).

As we held [ ] in *Trach v. Fellin,* 817 A.2d 1102 (Pa.Super.2003) [ *(en banc),* appeal denied, 577 Pa. 725, 847 A.2d 1288 (2004) ], the *Frye* test sets forth an exclusionary rule of evidence that applies only when a party wishes to introduce novel scientific evidence obtained from the conclusions of an expert scientific witness. *Trach,* 817 A.2d at 1108–1109. Under *Frye,* a party wishing to introduce such evidence must demonstrate to the trial court that the relevant scientific community has reached general acceptance of the principles and methodology employed by the expert witness before the trial court will allow the expert witness to testify regarding his conclusions. *Id.,* 817 A.2d at 1108–1109, 1112.

However, the conclusions reached by the expert witness from generally accepted principles and methodologies need not also be generally accepted. *Id.,* 817 A.2d at 1112. Thus, a court's inquiry into whether a particular scientific process is "generally accepted" is an effort to ensure that the result of the scientific process, *i.e.,* the proffered evidence, stems from "scientific research which has been conducted in a fashion that is generally recognized as being sound, and is not the fanciful creations [sic] of a

---

**2.** President Judge Emeritus Del Sole authored the lead opinion in *Craft;* Judge Beck concurred in the result only, and Judge Johnson filed a concurring opinion. Judge Johnson would have found the issue waived for failure to raise it in pre-trial motions or during trial, and would have affirmed on that basis. *Id.* at 398–399. Judge Johnson would not have reached the merits of the issue. *Id.* Therefore, *Craft* is a plurality decision and is not binding on this court. Nevertheless, we find Judge Del Sole's arguments to be persuasive.

renegade researcher." *See id.,* 817 A.2d at 1111 (quoting *Blum v. Merrell Dow Pharms., Inc.,* 564 Pa. 3, 9–10, 764 A.2d 1, 5 (2000) (Cappy, C.J., dissenting)).

*Reading Radio, Inc. v. Fink,* 833 A.2d 199, 208 (Pa.Super.2003), *appeal denied,* 577 Pa. 723, 847 A.2d 1287 (2004) (emphasis deleted).

[A]s to the standard of appellate review that applies to the *Frye* issue, we have stated that the admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion. *See Commonwealth v. Zook,* [532 Pa. 79, 98–99], 615 A.2d [1] at 11 [ (1992), *cert. denied,* 507 U.S. 974, 113 S.Ct. 1420, 122 L.Ed.2d 789 (1993) ]. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. *Paden v. Baker Concrete Constr., Inc.,* 540 Pa. 409, 658 A.2d 341, 343 (1995).

*Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 559, 839 A.2d 1038, 1046 (2003). "[W]e emphasize that the proponent of expert scientific evidence bears the burden of establishing all of the elements for its admission under Pa.R.E. 702, which includes showing that the *Frye* rule is satisfied." *Id.* at 558, 839 A.2d at 1045. "[I]n applying the *Frye* rule, we have required and continue to require that the proponent of the evidence prove that the methodology an expert used is generally accepted by scientists in the relevant field as a method for arriving at the conclusion the expert will testify to at trial." *Id.,* citing *Commonwealth v. Blasioli,* 552 Pa. 149, 152–53, 713 A.2d 1117, 1119 (1998).

Recently, in *Commonwealth v. Szakal,* 50 A.3d 210 (Pa.Super.2012), we upheld the trial court's denial of the defendant's request to call Dr. Debra Davis, an expert in the field of false confessions:

[I]f the expert is only testifying generally about the fact that false confessions happen, that is well within the grasp of the average layperson and expert testimony would not be required under Rule 702. The components of a false confession, according to Dr. Davis, include factors such as the interrogation tactics employed, the training of the law enforcement personnel involved, and the stress tolerance of the suspect. This [c]ourt found that testimony concerning these factors can be elicited (and attacked) through the testimony of other witnesses and is capable of being understood by the average juror. The jury can then make its own determination as to the weight afforded to the defendant's confession. Therefore, Dr. Davis' testimony was not proper because expert testimony is inadmissible when the matter can be described to the jury and the conditions evaluated by them without the assistance of one claiming to possess special knowledge upon the subject.

*Id.* at 228, quoting trial court opinion, 6/9/10 at 30–32. "We find no error with the trial court's analysis and ultimate decision to preclude Dr. Davis' testimony as it would not assist the trier of fact." *Id.*

Similarly, here, in addition to identifying various problems with Dr. Ofshe's methodology, the trial court opined that the issue of false confessions was not beyond the ken of the average layperson:

First, the Court is not convinced that any specialized knowledge is required for jurors to understand the proposition that a person possessing any of a number of unique factors (mental disability, fatigue, hunger, tender age, propensity

toward acquiescence to authority figures etc.) may be more susceptible to police interrogative techniques. Further, the jurors would certainly be able to evaluate any evidence or arguments presented at trial by the defense to advance a theory that the conditions of [appellant]'s interrogation, the techniques used by police, or the personal characteristics of [appellant] had an impact on the veracity or voluntariness of [appellant]'s confession without the assistance of the proffered expert testimony. If anything, the testimony could confuse the issue by suggesting causal relationships which are not borne out by the research actually conducted.

Trial court opinion, 10/6/10 at 5; Commonwealth's brief, Appendix A. We agree and find that the trial court did not abuse its discretion by precluding Dr. Ofshe's testimony.

■ In his third issue on appeal, appellant argues that the trial court erred in directing him to turn over verbatim or substantially verbatim statements of defense witnesses. The trial court ordered as follows:

> Any and all statements of the defense witnesses taken by defense may be requested by the Commonwealth at the beginning of cross examination. Specifically, in accordance with "Commonwealth versus Brinkley" and "Commonwealth versus Perez", the statements are those statements that were signed, adopted or otherwise shown to be substantial and/or verbatim statements of the witness. The Commonwealth will need to elicit from each witness whether the witness provided any such statement to the defense. At that time the defense will provide all applicable statements to the Commonwealth, and the Commonwealth will be allowed and allotted suffi-

cient time to review each such statement.

Notes of testimony, 10/21–11/19/10, Vol. II at 964.

In *Commonwealth v. Brinkley,* 505 Pa. 442, 480 A.2d 980 (1984), the defendant was ordered to turn over to the Commonwealth certain defense memoranda containing statements of four defense witnesses. *Id.* at 447–448, 480 A.2d at 983. Counsel objected to disclosure on the basis of the "work product" privilege. *Id.* at 448, 480 A.2d at 983. The Supreme Court of Pennsylvania rejected this argument, stating that, "The 'protective cloak' of the qualified work product privilege 'does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation.'" *Id.* at 449, 480 A.2d at 984, quoting *Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 91 L.Ed. 451 (1947). However, in what has subsequently been characterized as *dicta,* the *Brinkley* court went on to remark that, "It is well established that where the Commonwealth has in its possession pretrial statements of its witnesses which have been reduced to writing and relate to the witness' testimony at trial, it must, if requested, furnish copies of these statements to the defense. So too, where the defense attorney possesses pretrial statements of witnesses, the needs of the criminal justice system require disclosure." *Id.* (citation omitted). "To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for production of evidence needed *either by the prosecution or the defense." Id.* at 450, 480 A.2d at 984, quoting *United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (emphasis in *Brinkley* ).

In a concurring opinion, Chief Justice Nix noted that the sole argument raised before the trial court and on appeal was

that the material was attorney work product and, therefore, privileged against disclosure. *Id.* at 459, 480 A.2d at 989. Chief Justice Nix agreed that the material disclosed did not fall within any accepted definition of "attorney work product." *Id.* However, he maintained that had defense counsel objected on the grounds that disclosure of the subject statements was not authorized by the Rules of Criminal Procedure, the admission of the statements would have been error. *Id.* at 460, 480 A.2d at 990. Chief Justice Nix rejected any implication that a reciprocal prosecutorial discovery right exists: "What compels me to write separately is the majority's unnecessary attempt to bolster its conclusion that the statements were not 'work product' with dicta which implies that the Commonwealth should be entitled to full reciprocal discovery in criminal prosecutions. I strongly disagree with such a suggestion." *Id.* "It would be a mockery of due process if the state could, in addition to relying on its infinitely more effective position as an investigating body and its superior resources, compel the defendant to lighten the prosecution's burden of proving its case through the discovery process." *Id.* at 461, 480 A.2d at 990, citing *Murphy v. Waterfront Comm.,* 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

In *Commonwealth v. Perez,* 698 A.2d 640 (Pa.Super.1997), the Commonwealth made a blanket discovery request for any and all written statements from defense witnesses who were expected to testify at trial. *Id.* at 642. The trial court concluded that *Brinkley* required disclosure of statements that were signed, adopted or otherwise shown to be substantially verbatim statements of the witnesses. *Id.* The trial court compelled the defense to disclose a signed, notarized statement of Jose Rodriguez, finding that it was the only statement that met the requirements set forth in *Brinkley.* *Id.* The Commonwealth then used this statement to impeach Rodriguez's testimony on cross-examination. *Id.*

This court determined that the trial court erred in approving blanket discovery of the defense witnesses' statements. We noted that the comments in *Brinkley* which are read to create such discovery rights are *dicta* and are not controlling, and that *Brinkley* has not been affirmatively cited for the privilege of reciprocal discovery in any subsequent case. *Id.* at 643–644. As Chief Justice Nix observed, the only issue to be decided in *Brinkley* was whether the work product doctrine barred disclosure of the witness statements. *Id.* at 643. In *Perez,* the defendant did not claim work product, rather he argued that the Rules of Criminal Procedure did not entitle the Commonwealth to such a request for reciprocal discovery. This court agreed, citing Pa.R.Crim.P., Rule 573(C), 42 Pa.C.S.A. (formerly Rule 305): "Nowhere in this explicit rule does it grant a right to written or taped statements of defense fact-witnesses. Thus, although our Supreme Court has suggested that defense witness statements are discoverable, they have not amended the Rules of Criminal Procedure to include such broad and sweeping reciprocal discovery rights and until our high court advises otherwise we choose to read *Brinkley* narrowly." *Id.* at 644, citing *Commonwealth v. Stehley,* 350 Pa.Super. 311, 504 A.2d 854, 858 (1986) ("[w]hile the rules specifically require the Commonwealth to disclose such witness statements, the rules do not provide [the Commonwealth] with reciprocal discovery.").

Ultimately, however, while this court in *Perez* found that the trial court's tacit approval of mutual discovery rights was in error, we affirmed on the basis that Rodriguez admitted giving a statement to a

defense investigator on the witness stand. *Id.* at 645. "It is basic law that when a witness has given a statement to a party and testifies on behalf of that party, an adverse party may obtain disclosures or that statement for review and use on cross-examination." *Id.* (citations omitted).

Instantly, the trial court did not grant the Commonwealth blanket discovery, nor did the trial court tacitly approve a reciprocal discovery right as in *Perez.* Rather, the trial court directed that on cross-examination, the Commonwealth would need to elicit from each witness whether or not he provided the defense with a statement. (Notes of testimony, 10/21–11/19/10, Vol. II at 964.) If so, then such statements would be turned over to the Commonwealth at that time. *(Id.)* The trial court's order applied only to statements signed, adopted or otherwise shown to be substantially verbatim statements. *(Id.)* This is in accordance with established law and the trial court did not approve mutual discovery. *Commonwealth v. Presbury,* 445 Pa.Super. 362, 665 A.2d 825, 831–832 (1995), *appeal denied,* 544 Pa. 627, 675 A.2d 1246 (1996) (discussing when prior inconsistent statements are admissible as substantive evidence).

Furthermore, contrary to appellant's assertions on appeal, the trial court permitted the defense to redact the statements to remove opinions of the defense investigator, references to trial strategy, *etc.* (Notes of testimony, 10/21–11/19/10, Vol. II at 965.) Since the trial court was sitting as fact-finder, it was impossible to conduct *in camera* review to determine which statements were discoverable. *(See* trial court opinion, 7/13/11 at 16.) Therefore, the trial court and the Commonwealth agreed that the statements could be redacted by the defense. *(Id.)*

Appellant complains that some of the statements related to matters outside the scope of direct examination. (Notes of testimony, 10/21–11/19/10, Vol. III at 1352; appellant's brief at 33–34.) However, he fails to specifically identify any such statement. We determine that the trial court's order was not improper.

■■■■ In his fourth issue on appeal, appellant claims that his statements to police were made involuntarily. Appellant claims that the trial court erred in denying his motion to suppress his inculpatory statements to police, where he did not knowingly, intelligently, and voluntarily waive his constitutional right to remain silent.

> In reviewing the denial of a motion to suppress, our responsibility is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. If the suppression court held for the prosecution, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, the appellate court may reverse if there is an error in the legal conclusions drawn from those factual findings.

*Commonwealth v. Lopez,* 415 Pa.Super. 252, 609 A.2d 177, 178–79 (1992) (citation omitted).

> A confession obtained during a custodial interrogation is admissible where the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. The test for determining the

voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession.

*Commonwealth v. Jones,* 546 Pa. 161, 170, 683 A.2d 1181, 1189 (1996) (citations omitted). 'The Commonwealth bears the burden of establishing whether a defendant knowingly and voluntarily waived his *Miranda* 'rights.'[3] *Commonwealth v. Bronshtein,* 547 Pa. 460, 464, 691 A.2d 907, 913 (1997) (citation omitted).

*Commonwealth v. Davis,* 861 A.2d 310, 317 (Pa.Super.2004), *appeal denied,* 582 Pa. 708, 872 A.2d 171 (2005).

When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. Voluntariness is determined from the totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.

*Commonwealth v. Nester,* 551 Pa. 157, 162–163, 709 A.2d 879, 882 (1998) (citations and footnote omitted).

When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

*Id.* at 164, 709 A.2d at 882 (citations omitted). "The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review." *Commonwealth v. Templin,* 568 Pa. 306, 310, 795 A.2d 959, 961 (2002), citing *Nester, supra.*

We agree with the trial court that appellant knowingly and voluntarily waived his *Miranda* rights and gave a voluntary confession. While noting the length of appellant's detention and the time of day, the trial court found that several factors militated in favor of appellant's confession being voluntary:

Notably, the method by which he answered the officer's questions, his responses were completely responsive and he provided his initials after each answer. He read along with the officer while the officer read the *Miranda* rights and waiver form. Both reading words and hearing them spoken drastically increase the likelihood that Appellant comprehended their meaning. He did not appear tired or intoxicated. He was offered food, though he chose not to consume it. He was given a bathroom break. There was no testimony concerning Corporal Bramhall's demeanor as being unorthodox or inappropriate. While the presence of two officers, with their sidearms at their sides, would seem to weigh on coerciveness, the Appellant's experience with law enforcement diminishes the effect of such visual stimuli.[4]

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Appellant has an extensive criminal record and was on parole at the time of the murders. (Trial court opinion, 7/13/11 at 22.)

The officers' statements to the Appellant, first that they did not believe his story and second that they knew he had killed Dave and Crystal elicited responses from Appellant which were not coerced. Appellant was in a sound mind during the questioning and in fact had regaled the officers with a two-hour narrative of his activities for the day in question. There was little in the record to suggest that Appellant is unable to psychologically deal with such accusatory statements. Indeed, Appellant himself testified at trial and demonstrated to the Court an extensive vocabulary and spoke very clearly.

The length of the interview was not unduly burdensome on Appellant's will, nor was the fact that he was in custody at the time. He demonstrated a calm demeanor when escorted to the interview room. He spoke for two hours of the roughly four hour interview. While he certainly was not free to leave, his needs were accommodated. The fact that the officers confronted Appellant with the "holes" in his story and accused him of the murders was not impermissively [sic] coercive. A certain amount of psychological persuasion is permitted. *See Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251 (1994). In addition, Appellant demonstrated control of his faculties when he refused to explain where he had come into possession of the gun he used in the killings and when he refused to do a taped confession. Trial court opinion, 7/13/11 at 22–23.

Appellant argues that his confession was involuntary because of the delay between his arrest and his arraignment. (Appellant's brief at 41–42.) According to appellant, he was not arraigned on these charges until five months later, in violation of Pa.R.Crim.P. 519.[5] (*Id.* at 42.) However, the record indicates that appellant was actually arrested on a detainer, and was not formally charged in this case until June 2008. Furthermore, this argument was not raised in appellant's Rule 1925(b) statement and is waived on appeal. Pa. R.A.P., Rule 1925(b)(4)(vii), 42 Pa.C.S.A.

Appellant also argues that the fact the police did not record his interrogation and confession is evidence that it was coerced. (Appellant's brief at 43.) We have already addressed this issue and concluded that the officers were not required to record appellant's interrogation and confession. We also observe that appellant declined to have his confession taped.

The totality of the circumstances indicate that appellant knowingly and voluntarily chose to waive his *Miranda* rights and make a statement. The trial court did not err in denying appellant's motion to suppress his inculpatory statements to police.

▆▆▆▆ Next, appellant argues that the initial search of his home was unconstitutional as it was a warrantless search and there were no exigent circumstances present. Appellant also argues that the search warrants were insufficient and were tainted by the illegality of the initial, warrantless search. We disagree.

> A protective sweep is "a quick and limited search of [the] premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) [ ]. There are two levels of protective

**5.** *See* Pa.R.Crim.P., Rule 519(A)(1), 42 Pa. C.S.A. ("when a defendant has been arrested without a warrant in a court case, a complaint shall be filed against the defendant and the defendant shall be afforded a preliminary arraignment by the proper issuing authority without unnecessary delay.")

sweeps: (1) officers can, without probable cause or reasonable suspicion, look in closets and other spaces close to the place of arrest from which an attack could be launched and (2) officers can search for attackers further away from the place of arrest if they can sufficiently articulate specific facts that justify a reasonable fear for the safety of officers on the premises. *See Commonwealth v. Taylor,* 565 Pa. 140, 771 A.2d 1261, 1267 (2001).

*In re J.E.,* 907 A.2d 1114, 1118 (Pa.Super.2006), *affirmed,* 594 Pa. 528, 937 A.2d 421 (2007) (emphasis deleted).

Here, officers arrested appellant on the front porch of his residence. (Trial court opinion, 7/13/11 at 29.) However, they did not recover the weapon used to kill the two victims. *(Id.)* A female, described as frantic, exited the residence and informed officers that there were children inside. *(Id.)* Officers did not know at that time if there was anyone else involved in the shooting, if the murder weapon was inside the house, or if the children were in danger. *(Id.)* Under these circumstances, the officers were justified in performing a protective sweep of the residence.

Appellant also argues that the search warrants were insufficient, specifically those issued on January 18, 2008 and July 18, 2008. (Appellant's brief at 49.) Appellant argues that the affidavits of probable cause omitted critical details including when Melissa Ranck last saw appellant in possession of the firearm; the reliability of the K–9 units and their handlers; and information regarding the Commonwealth's key witness, Baney, such as her criminal history, her multiple versions of events that night, and the fact that she failed a polygraph test. *(Id.* at 50.)

As we have often indicated, the legal principles applicable when reviewing the sufficiency of an affidavit to determine whether it establishes the probable cause necessary for the issuance of a warrant are well established. Before an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. The information offered to demonstrate probable cause must be viewed in a common sense, nontechnical, ungrudging and positive manner. It must also be remembered that probable cause is based on a finding of the probability, not a *prima facie* showing of criminal activity, and that deference is to be accorded a magistrate's finding of probable cause.

*Commonwealth v. Baker,* 532 Pa. 121, 126–127, 615 A.2d 23, 25 (1992) (citations omitted).

■ The affidavit of probable cause in support of the January 18, 2008 search warrant alleged, *inter alia,* that when officers arrived at the scene of the shooting they observed the two victims with multiple gunshot wounds. (Notes of testimony, 4/16/09, Commonwealth's Exhibit 12.) Both were pronounced dead at the scene. *(Id.)* An eyewitness, Amy Baney–Banks, told police that a black male known as "Michael" shot the victims. *(Id.)* He was described as wearing black sweatpants, black sneakers, a black hoodie and carrying a brown and black firearm. *(Id.)* K–9 units eventually led police to 19 Fairmount Avenue, where appellant was taken into custody. *(Id.)* When officers entered the residence to secure the scene, they observed a tub filled with steaming water. *(Id.)* Inside the tub appeared to be a dark pair of sweatpants and bloody water. *(Id.)*

Melissa Ranck identified appellant as Michael Harrell and stated that he had a .30 caliber firearm, brown and black in color, which was consistent with Baney's

description of the murder weapon. *(Id.)* Ranck also informed police that earlier that night, appellant was wearing a black shirt, black sweatpants and black Nike sneakers. *(Id.)* Baney identified appellant as the shooter in a photo array. *(Id.)* The January 18, 2008 search warrant application sought the clothing worn by appellant at the time he was taken into custody, including the black Nike sneakers. *(Id.)*

Clearly, the January 18, 2008 affidavit of probable cause was sufficient for a search warrant to issue. Police had an eyewitness, Baney, who identified appellant and stated that he was the shooter. K–9 units tracked appellant to the residence. Ranck confirmed that appellant was wearing black sweatpants and black sneakers that night and possessed a .30 caliber, brown and black firearm. When officers went inside the residence to perform their protective sweep, they observed bloody dark colored sweatpants soaking in hot water.

Appellant complains that the search warrant was tainted by the initial, illegal warrantless search. (Appellant's brief at 49.) Specifically, appellant contends that the search warrant was based on the articles of clothing officers observed soaking in the kitchen. *(Id.)*

We have already concluded, for the reasons discussed above, that the warrantless entry was justified as a protective sweep. Therefore, officers were in a lawful position to view the bloody clothes. Furthermore, even if we disregard the allegation concerning the bloody sweatpants, there were sufficient independent facts to justify issuance of a warrant.

█ Regarding the July 18, 2008 search warrant application for the .30 caliber firearm, appellant claims it was based on "stale" information. Appellant argues

that it was based on a photograph from 2006. *(Id.* at 50–51.)

The July 18, 2008 affidavit of probable cause alleged that, as stated above, Ranck identified appellant as Michael Harrell and stated that he owned a .30 caliber firearm matching Baney's description of the one used in the shooting of January 18, 2008. (Notes of testimony, 4/16/09, Commonwealth's Exhibit 13.) Ranck identified herself as appellant's live-in girlfriend. *(Id.)* Officer Vern Petty also observed an October 2006 photograph of appellant holding a firearm. *(Id.)* The affidavit further alleges that on June 2, 2008, police were contacted by Randi Musser, the current tenant of 19 Fairmount Avenue. Musser related that she was contacted by Ranck's half-brother who requested permission to go into the attic to retrieve the firearm. *(Id.)* According to Musser, Ranck wanted her half-brother to pull up the floor boards where the murder weapon was supposedly stashed. *(Id.)* An earlier search of the attic was conducted by police but portions of the attic could not be searched due to thick layers of insulation below the floor boards. *(Id.)* The search warrant affidavit requested permission to search the attic again using a sophisticated metal detector. *(Id.)*

Again, appellant's argument is patently meritless. The July 18, 2008 affidavit was more than sufficient for a search warrant to issue regardless of the allegation concerning the October 2006 photograph. Police did not recover the murder weapon and they had new information that it may be stashed under the floor boards in the attic. The trial court did not err in denying appellant's motion to suppress physical evidence.

█ In his sixth and final issue on appeal [6], appellant argues that his constitu-

---

6. Appellant also raised a sufficiency claim in

his Rule 1925(b) statement which was ad-

tional right to counsel was violated when he was not provided counsel at the photographic line-up. As stated above in the recitation of the facts, Baney picked appellant out of a photo array the morning of January 18, 2008. Appellant asserts that he was entitled to have counsel present at that line-up.

Appellant is correct that in Pennsylvania, a defendant has a constitutional right to have counsel present during identification procedures. *See Commonwealth v. Whiting*, 439 Pa. 205, 266 A.2d 738 (1970), *cert. denied*, 400 U.S. 919, 91 S.Ct. 173, 27 L.Ed.2d 159 (1970), and its progeny.[7] However, this right is triggered by the arrest of the accused. *See Commonwealth v. DeHart*, 512 Pa. 235, 253, 516 A.2d 656, 665 (1986), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987) ("To extend the Sixth Amendment right to counsel during photographic identification proceedings to any person merely suspected of a crime would be an unreasonable burden on law enforcement officials and on the taxpayer, who in many instances must ultimately underwrite the cost of such representation.").

Instantly, appellant was arrested on January 18, 2008 on a detainer for violating his parole, not for the murders. (Trial court opinion, 7/13/11 at 33.) Appellant was not formally charged with the offenses in this case until June 4, 2008, when the criminal complaint was filed. *(Id.)* Therefore, appellant did not have a right to counsel at the photographic line-up on January 18, 2008. *See Commonwealth v. Blassingale*, 398 Pa.Super. 379, 581 A.2d 183, 190 (1990), citing *Commonwealth v. McKnight*, 311 Pa.Super. 370, 457 A.2d

931, 934 (1983) ("in Pennsylvania, the right to counsel at a photographic array does not attach when the suspect is in custody for a different offense than that for which the array has been compiled.").

At any rate, there was an independent basis supporting Baney's identification of appellant at trial. *See Whiting, supra*, 439 Pa. at 210, 266 A.2d at 740 ("Since appellant's right to counsel at the pretrial identifications was violated, the victim should not have been permitted to make her in-court identification, absent a showing that the identification had an 'independent origin.'") (citation omitted). Here, Baney testified that she had known appellant for approximately two years prior to the shooting and saw him "every day." (Notes of testimony, 10/21–11/19/10, Vol. I at 366.) In fact, they had a sexual relationship "on and off" until December 2007. *(Id.)* In addition to the photo array, Baney clearly identified appellant as the shooter at trial. *(Id.* at 389.) Therefore, there was an independent basis for Baney's identification. Appellant's argument fails.

Judgment of sentence affirmed.

DONOHUE, J. files a Dissenting Opinion.

## DISSENTING OPINION BY DONOHUE, J.:

I respectfully dissent, as I conclude that the trial court abused its discretion in denying Harrell's motion *in limine* to permit the expert testimony of Dr. Richard Ofshe ("Dr. Ofshe") with respect to the phenomenon of false confessions and the role of police interrogation tactics in causing

---

dressed by the trial court in its opinion; however, appellant has abandoned the issue on appeal.

**7.** The *Whiting* standard is more favorable to the accused than the federal standard; no

such right to have counsel present during photographic lineups is provided under the Sixth Amendment to the United States Constitution. *See United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

them. Dr. Ofshe is a qualified expert who has testified in numerous trials in which defendants questioned the reliability of their confessions. As an expert in the field of social psychology, Dr. Ofshe was prepared to testify that false confessions do occur, to provide explanations for why people sometimes engage in such counter-intuitive behavior, and to discuss the various types of police interrogation tactics that are more likely to cause a person to confess to a crime he did not commit. Reply Brief for Appellant at 6. He would not have testified that Harrell had falsely confessed in the present case, leaving that decision solely for the finder of fact. *Id.* at 10–11.

Our standard of review with regard to the admissibility of Dr. Ofshe's testimony is as follows:

> [T]he admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Page,* 59 A.3d 1118, 1135 (Pa.Super.2013). The admissibility of an expert opinion is governed by Rule 702 of the Pennsylvania Rules of Evidence.

### Rule 702. Testimony by experts

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702. "The purpose of expert testimony is to assist the fact finder in grasping complex issues not within the knowledge, intelligence, and experience of the ordinary layman." *Commonwealth v. Begley,* 566 Pa. 239, 266, 780 A.2d 605, 621 (2001).

The Majority affirms the trial court's denial of Harrell's motion *in limine* by adopting the trial court's unsupported opinion that "the issue of false confessions was not beyond the ken of the average layperson." Majority Opinion at 430. In so finding, the Majority relies exclusively on a recent panel decision from this Court in *Commonwealth v. Szakal,* 50 A.3d 210 (Pa.Super.2012). In *Szakal,* a panel of this Court adopted an observation of the trial court in that case that the jury there was capable of understanding that false confessions occur and could assess the veracity of the confession at issue "without the assistance of one claiming to possess special knowledge upon the subject." *Id.* at 229 (quoting Trial Court Opinion, 6/9/10, at 32). In the present case, the trial court similarly remarked that "the jurors would certainly be able to evaluate any evidence or arguments presented at trial by the defense ... without the assistance of [Dr. Ofshe's] expert testimony." Trial Court Opinion, 10/6/10, at 5.[1]

---

1. The trial court, per the Honorable Robert Sacavage, set forth this argument in a written opinion denying Harrell's Motion to Admit Expert Testimony on October 6, 2010. In his opinion, Judge Sacavage also set forth two additional reasons for his decision: (1) the proffered testimony might infringe upon the province of the jury's role as fact finder, and (2) Dr. Ofshe's testimony does not qualify for admission pursuant to the dictates of *Frye v. U.S.,* 293 F. 1013 (D.C.Cir.1923) and *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977). Unlike the Majority, I address these two arguments *infra.*

The Majority's reliance on *Szakal* here is misplaced, as the present case is clearly distinguishable. In particular, the Majority quotes only a portion of the trial court's decision in *Szakal,* and excludes the following important passage:

> Basically, the defense in this case was that [Appellant] lied in his recorded statement to police about his role in the murders of Mr. and Mrs. Springer. He claimed to be telling the truth when he took the stand and implicated his co-defendant, Mr. Tartt, as the trigger man. In other words, [Appellant] asked the jury to believe that he falsely confessed to the murders. The issue then, is whether the average juror, in this case, needed to be told that false confessions occur? *This [c]ourt found that the jury did not; as almost every juror in the pool indicated that [he or she] believed that false confessions do occur. In fact, defense counsel raised that point in his closing argument.*

*Szakal,* 50 A.3d at 228 (emphasis added).

As the highlighted language reflects, in *Szakal* the individual members of the jury were questioned (presumably during *voir dire* ) regarding their beliefs on the existence of false confessions, and the answers of most of the jurors reflected that they believed false confessions do occur. While the *Szakal* opinion does not provide any detailed information regarding the jurors' responses, including either the source or extent of their beliefs, the trial court in *Szakal* obviously proceeded with an understanding that the jurors selected in that case accepted the proposition that false confessions occur. That understanding unquestionably influenced the *Szakal* trial court's decision to exclude expert testimony on the topic, and likewise influenced this Court's affirmance of that determination. Thus, the precedential value of *Szakal* is limited to its circumstances.

In Harrell's case, in significant contrast, the trial court had no information about the extent (if any) of the jurors' knowledge of false confessions. In fact, because Harrell raised the issue of the admissibility of Dr. Ofshe's testimony in a motion *in limine* well before the start of trial, no jury had been selected at the time the trial court hypothesized that the jurors would be sufficiently knowledgeable about the phenomenon of false confessions so that Dr. Ofshe's testimony would not be necessary. Not surprisingly, neither the trial court nor the Majority here offers *any evidentiary support* for the contention that as-yet-unselected jurors would have any basis to believe that false confessions do or do not occur.

Harrell, on the other hand, introduced into evidence numerous empirical studies tending to show that while ordinary jurors may understand that police interrogation tactics are intended to be coercive in nature, they are also likely to believe that such tactics are typically likely to elicit confessions only from the guilty and not from the innocent. N.T., 9/20/10, at Ex. I

Immediately before the start of trial, and after the ruling excluding the expert testimony, Harrell agreed to waive his right to a jury trial, and Judge Sacavage agreed to recuse himself from the bench trial. The Honorable Wm. Harvey Wiest was assigned to conduct the bench trial. In his subsequent Pa.R.A.P. 1925(a) written opinion, Judge Wiest, for reasons substantially similar to those expressed by Judge Sacavage in his October 2010 opinion, concluded that Dr. Ofshe's testimony does not qualify for admission pursuant to the dictates of *Frye* and *Topa.* Trial Court Opinion, 7/13/11, at 9–14. Judge Wiest's Rule 1925(a) opinion does not mention the sole issue addressed by the Majority (regarding the fact-finder's ability to evaluate false confession evidence without expert testimony), or Judge Sacavage's view that expert testimony in this area could invade upon the jury's role as fact finder.

(Richard A. Leo and Brittany Liu, *What Do Potential Jurors Know About Police Interrogation Techniques and False Confessions*, Behavioral Sciences and the Law (2009)); *Id.* at Ex. J (Linda A. Henkel, Kimberly A. Coffman, and Elizabeth M. Dailey, *A Survey of People's Attitudes and Beliefs About False Confessions*, Behavioral Sciences and the Law (2008)); *Id.* at Ex. K (Iris Blandon–Gitlin, Kathryn Sperry, and Richard A. Leo, *Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions*, Psychology, Crime & Law (2010)).

The Commonwealth essentially concedes the lack of any support for the notion that the jurors in this case (once selected) would have had prior knowledge and experience regarding police interrogation tactics and their potential to elicit false confessions. In its brief to the trial court, the Commonwealth argued instead that potential jurors have "broad experience" in this area as a result of watching crime movies and the "never ending series of TV shows." Commonwealth's Brief in Opposition to Expert's Testimony on "False Confessions," 5/27/10, at 14. According to the Commonwealth, "since the Salem Witch Trials, the American psyche has been aware of instances when false confessions have occurred." *Id.*

Even to the extent that movies and TV shows accurately portray various aspects of our criminal justice system (a highly dubious if not preposterous assumption), when a citizen's liberty is at stake, entertainment media is no substitute for the presentation of social scientific research conducted by professionals in the field. The notion that innocent individuals would confess to a crime they did not commit and thus subject themselves to imprisonment (or even the death penalty) is inherently counter-intuitive, and the reasons why a person would do so are not matters of common knowledge. *See, e.g., Commonwealth v. Minerd*, 562 Pa. 46, 55, 753 A.2d 225, 230 (2000) (expert testimony admissible where is issue is not a matter of common knowledge). As one federal court aptly observed, "Even though the jury may have had beliefs about the subject, the question is whether those beliefs were correct. Properly conducted social science research often shows that commonly held beliefs are in error ." *United States. v. Hall*, 93 F.3d 1337, 1345 (7th Cir.1996).

For these reasons, I cannot agree that Dr. Ofshe's testimony was unnecessary because jurors are already knowledgeable about coercive police interrogation tactics and their potential to elicit false confessions. In my view, Dr. Ofshe's testimony would have assisted the finder of fact in this case in its attempt to understand the counter-intuitive phenomenon of false confessions, and thus it should have been admitted at trial. The trial court's decision to exclude this expert testimony was a clear abuse of discretion, based upon "such lack of support so as to be clearly erroneous." *Page*, 59 A.3d at 1135.

Two additional arguments proffered by the trial court for denying Harrell's motion *in limine*, neither of which is addressed by the learned Majority, are (1) Dr. Ofshe's testimony would usurp the jury's function to determine the credibility of witnesses, and (2) Dr. Ofshe's testimony does not meet the requirements for admissibility under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923) and *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977). I will address these contentions in turn.

In denying Harrell's motion *in limine*, the trial court noted that "the proffered testimony could in fact infringe upon the province of the jury as fact finder." Trial Court Opinion, 10/6/10, at 5. While the trial court did not cite to any case law in support of this contention, the Commonwealth

has referred us to several decisions of the Pennsylvania Supreme Court holding that expert opinion may not intrude upon the jury's basic function of deciding credibility.[2] *See, e.g., Commonwealth v. Spence,* 534 Pa. 233, 246, 627 A.2d 1176, 1182 (1993); *Commonwealth v. Gallagher,* 519 Pa. 291, 294, 547 A.2d 355, 357 (1988); *Commonwealth v. Seese,* 512 Pa. 439, 517 A.2d 920 (1986).

This line of cases has no application to the admissibility of Dr. Ofshe's proposed testimony, as they all contain instances of the introduction of expert testimony for the purpose of bolstering (or attacking) the credibility of another witness at trial. In *Spence,* the defendant offered the testimony of a psychologist to testify that someone under the stress of an attack might have difficulty identifying his attacker. *Spence,* 534 Pa. at 246, 627 A.2d at 1182. In *Gallagher,* the Supreme Court found error by the trial court in allowing the Commonwealth to introduce expert witness on "rape trauma syndrome" in an effort to explain why a victim could have a difficult time in making a timely identification of the assailant. *Gallagher,* 519 Pa. at 294, 547 A.2d at 357 (expert testimony can never be used "for the sole purpose of shoring up" the credibility of a witness). And in *Seese,* the Supreme Court reversed a trial court's decision to permit the Commonwealth to introduce the testimony of a pediatrician regarding the veracity of eight-year-old children who had allegedly been sexually abused. *Seese,* 512 Pa. at 443–44, 517 A.2d at 922. "The question of whether a particular witness is testifying in a truthful manner is one that must be answered in reliance upon inferences drawn from the ordinary experiences of life and common knowledge as to the tendencies of human nature, as well as upon observations of the demeanor and character of the witness." *Id.*

In the instant case, Dr. Ofshe would not have offered any opinion regarding the truthfulness of Harrell's confession. N.T., 9/20/10, at 65 (Dr. Ofshe stating: "I never testify as to an opinion I might have, if I have one, as to what the truth of the matter is."). Instead, the intended function of Dr. Ofshe's testimony was to describe various coercive police interrogation tactics and their role in eliciting a false confession. *Id.* at 64–65. Most importantly for purposes of the case at bar, Dr. Ofshe's testimony would not have changed the fundamental question for the finder of fact—namely, whether Harrell was telling the truth when he confessed during police interrogation, or whether he was telling the truth at trial when he testified that he was innocent and that his confession had been coerced. N.T., 11/19/10, at 1114–20. All issues of credibility remained solely with the finder of fact and, in my view, Dr. Ofshe's testimony would not intrude on the province of the jury.

Next, turning to the issue of admissibility standards, in *Topa* our Supreme Court adopted the test in *Frye* to determine whether novel scientific evidence may be admitted in criminal trials. *Topa,* 471 Pa. at 231, 369 A.2d at 1281 (adopting the *Frye* test). Under the *Frye* test, novel scientific evidence is admissible only if the methodology that underlies the evidence has general acceptance in the relevant scientific community. *Frye,* 293 F. at 1013; *Commonwealth v. Blasioli,* 552 Pa. 149, 153, 713 A.2d 1117, 1119 (1998). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509

---

**2.** In *Commonwealth v. Alicia,* —— Pa. ——, ——, 44 A.3d 1147, 1147 (2012), our Supreme Court granted a petition for allowance of appeal to address the following issue: "Under this Court's precedent, which the Superior Court mischaracterized and misapplied, does expert testimony on 'the phenomenon of false confessions' impermissibly invade the jury's exclusive role as the arbiter of credibility?" *Id.*

U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court rejected *Frye* for federal cases. Under *Daubert,* the "general acceptance" requirement is abandoned in favor of a test under which the trial judge evaluates whether the evidence will assist the trier of fact, and whether the evidence is reliable and scientifically valid. *Id.* at 592, 113 S.Ct. 2786. Some states followed in rejecting *Frye* and instead adopting *Daubert.*

In *Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 839 A.2d 1038 (2003), however, our Supreme Court reaffirmed its preference for *Frye* over *Daubert.* In so doing, the Court clarified two aspects of application of the *Frye* test that are important in the present case. First, under *Frye* and unlike under *Daubert,* it is the exclusive province of the *scientists* in the relevant field, by and through their general acceptance of the challenged methodology, to assess the reliability of a particular scientific method. *Id.* at 557, 839 A.2d at 1044–45. Trial judges make no independent determination regarding the trustworthiness of the methodology of the proffered expert, and must instead defer to the scientists in the relevant field.

> We believe now, as we did then, that requiring judges to pay deference to the conclusions of those who are in the best position to evaluate the merits of scientific theory and technique when ruling on the admissibility of scientific proof, as the *Frye* rule requires, is the better way of insuring that only reliable expert scientific evidence is admitted at trial.

*Id.* at 557, 839 A.2d at 1045.

Second, the trial court's exclusive focus in applying the *Frye* test must be on the *methodologies* employed by the proffered expert to arrive at his/her conclusions, and to this end, the trial court must decide whether the methodologies at issue have been generally accepted by scientists in the relevant field. *Id.* at 558, 839 A.2d at 1045. The proponent of the expert testimony has no burden to show that the proffered expert's conclusions have also gained general acceptance. *Id.* As our Supreme Court reaffirmed, this "is the sensible approach, for it imposes appropriate restrictions on the admission of scientific evidence, without stifling creativity and innovative thought." *Id.; see also Trach v. Fellin,* 817 A.2d 1102, 1111 (Pa.Super.2003) *(en banc)* (the purpose of the *Frye* test is to ensure that the proposed expert testimony is not merely "the fanciful creations [sic] of a renegade researcher") (quoting *Blum v. Merrell Dow Pharms., Inc.,* 564 Pa. 3, 9–10, 764 A.2d 1, 5 (2000) (Cappy, C.J., dissenting)), *appeal denied,* 577 Pa. 725, 847 A.2d 1288 (2004).

The trial court commenced an evidentiary hearing on Harrell's motion *in limine* on September 20, 2010, at which time Dr. Ofshe testified regarding his methodology and proposed testimony.[3] By way of background, Dr. Ofshe has a bachelor's degree in psychology, a master's degree in sociology, and a Ph.D from Stanford University. He is a professor emeritus on the faculty of the psychology department at the University of California Berkley, having taught there for nearly 40 years in the area of social psychology, with an emphasis on influence, decision-making, and group process. N.T., 9/20/10, at 5–6.

---

**3.** The gravamen of Dr. Ofshe's expert testimony rendered based upon his education, training, experience and research is that under certain circumstances, some innocent people falsely confess to committing crimes. Both Harrell and the Commonwealth agree that this expert testimony was subject to the strictures of a *Frye* hearing. I express no view as to whether this is accurate. *See, e.g., Haney v. Pagnanelli,* 830 A.2d 978, 982 (Pa.Super.2003) (*Frye* analysis is not implicated by every expert witness on scientific matters).

According to Dr. Ofshe, social psychology is a recognized subfield/specialty within both the American Sociological Association and the American Psychological Association. *Id.* at 11. Early in his professional career, Dr. Ofshe studied rational decision theory, performing laboratory based experiments on decision-making, particularly in connection with the organization and manipulative tactics of high control groups like cults. *Id.* at 7–8. In the mid–1980s, Dr. Ofshe turned his attention to influence in police interrogation tactics, including the phenomenon of false confessions. *Id.* at 9. He has been called the country's leading expert on the topic of false confessions, and his research is routinely cited in peer-reviewed publications by other professionals in the field. *Id.* at 26–27.

Dr. Ofshe's research methodology is straightforward—he isolates cases in which false confessions likely occurred, and then analyzes and studies the police interrogation tactics used to obtain those confessions. *Id.* at 40–44. He has reviewed more than 1,000 police interrogations. *Id.* at 30, 32, 39. His preference is to review fully recorded interrogations, but when no recording is available he will develop a record of events through interviews with (if possible) the interrogator and the person interrogated and have each of them prepare written statements of what happened during the interrogation. *Id.* at 40–41. Dr. Ofshe identifies some of the variables involved in interrogation tactics. These include various "setting variables," like where the interrogation takes place, how long it lasts, the access (or lack thereof) to food, water, and other necessities, and the demeanor and appearance of the interrogator. *Id.* at 28–29. These setting variables are intended to convey that the interrogator is in charge as well as to isolate the person being interrogated from any and all sources of support. *Id.* at 29.

More important, however, according to Dr. Ofshe, are the various types of "dynamic variables" that police interrogators use. There are two significant types of dynamic variables. *Id.* at 32. The first are "evidence ploys," in which the interrogator describes or displays evidence of the crime (*e.g.,* the testimony of witnesses, fingerprints, a murder weapon). The evidence may be actual or entirely fabricated (or a combination of both). Dr. Ofshe testified that evidence ploys are intended to make the person being interrogated believe that no amount of resistance or denial will ever convince anyone (including either the interrogator or the eventual judge and jury) of his/her innocence. *Id.* at 29–30. Police interrogators typically use evidence ploys early in the process, and often use several of them in succession, repeating them as necessary whenever the person denies guilt. *Id.* at 30.

Police interrogators also use a variety of "motivation ploys" designed to get the person to shift his/her thinking from continuing to deny guilt to recognizing the advantages of confessing. One type of motivating tactic is to appeal to the person's sense of decency. *Id.* at 32 ("Come on, be decent ... Be a man, admit that you did it. Admit to me, admit to the world."). Another motivating tactic is for the interrogator to describe the fundamentals of how the criminal justice system works, and explain to the person that *now* is the best time to admit guilt and show appropriate remorse, as it will be too late to do so beneficially later. *Id.* at 33. Other types of motivation ploys are to offer promises of a benefit in exchange for a confession,[4] to make implicit threats of harm if no confession is forthcoming, or to

---

4. As in, "if you do confess, I will do everything I can to help you. I will talk to my friend, the prosecutor. I will talk to the judge. I'll do this. I'll do that." *Id.* at 34.

communicate offers of leniency or threats of harm through the use of "scenarios."[5]

According to Dr. Ofshe, police interrogators are trained to use these setting variables and dynamic variables skillfully to obtain confessions. *Id.* The problem, however, comes when an individual innocent of the crime in question is subjected to these tactics, and makes "the conscious decision to give a false confession in exchange for avoidance of harm, threat, and offer of leniency." *Id.* at 37. Police interrogation "is a system of influence" that "is intended to be applied to someone who in fact committed a crime." *Id.* at 9. When applied to a person who did not commit a crime, however, the coercive tactics "could lead [the] person who knows they did not commit the crime to make the decision to give a false confession." *Id.* at 10.

The trial court found that Dr. Ofshe's "content analysis and sampling" in his study of false confessions are "generally accepted methodologies for *Frye/Topa* standards." Trial Court Opinion, 7/13/11, at 11. The trial court nevertheless denied Harrell's motion *in limine* because "Dr. Ofshe employs these methods in a way which is not consistent with their generally accepted use in the scientific community." *Id.* In particular, the trial court found that Dr. Ofshe's explanation, or "hypothesis,"

for how false confessions occur is not "provable" by any scientific methodology, and that as a result, Dr. Ofshe has not presented any theory of causation that would allow for a "statistically significant study" providing a numerical rate of frequency of false confessions. *Id.* Because Dr. Ofshe's method of study does not generate a specific "predictive value" of the frequency of false confessions, the trial court decided that his testimony would "strain the fact-finder's mind."[6] *Id.*

In so ruling, the trial court relied on the testimony of Paul Cassell, a former federal judge called to testify by the Commonwealth. Mr. Cassell testified that no research into the phenomenon of false confessions can proceed without empirical studies proving the precise frequency at which false confessions actually occur.

If police officers are using a tactic—let's call it tactic 'x'—and they apply it to ten thousand people in a particular state in a particular year, we'd like to know ... how many times did it produce a false confession? Was it one? Was it ten thousand? ... That's the critical bedrock factor that we have to have in order to start making conclusions about what techniques create the risk of false confessions.

---

5. When using scenarios, the interrogator describes how the person may have committed the crime and suggests that he/she would endorse that version of events without moral condemnation. *Id.* at 35 ("[in] [c]hild abuse cases, [for example,] the scenario might be you're not a pedophile, the kind of person who should go to prison forever and be killed in prison, but rather that you made a mistake, you loved the child too much, we need to get this family back together, you really need counseling ..."). The use of "scenarios" allows the interrogator to link subtly a confession with leniency and non-criminal solutions, and to contrast this suggested favorable outcome with the far more harsh punishment likely to result without a confession. *Id.*

6. The trial court also criticized Dr. Ofshe's evidence collection methods, indicating that interviews and written statements to create a record of what occurred during unrecorded interrogations are "not the best place" to obtain data. *Id.* at 12. The trial court likewise took issue with Dr. Ofshe's decision to isolate false confession interrogations to analyze and study, rather than to focus more generally on all interrogations leading to confessions. *Id.* at 13. The trial court did not, however, conclude that these criticisms of Dr. Ofshe's methodology amounted to violations of the *Frye* "generally acceptance" standard.

N.T., 9/29/10, at 47. Mr. Cassell also testified that in his view, a false confession is "a very low frequency event and that we need to do further research to try to get some understanding of how often false confessions occur." *Id.* at 48.

In his testimony, Dr. Ofshe did not disagree with Mr. Cassell that there is no precise frequency rate for the incidence of false confessions.[7] N.T., 9/20/10, at 39 ("We simply don't know that, and we probably never will."). Dr. Ofshe noted, however, that numerous empirical studies have established beyond any dispute that false confessions do occur. *Id.* at 47. With respect to Mr. Cassell's contention that no research has established any precise frequency rate for specific tactics resulting in false confessions, Dr. Ofshe's testimony described a complex process of interacting setting and dynamic factors that work together to influence a decision to falsely confess to a crime, rather than a more simplistic model of "if tactic x, then result y" that Mr. Cassell suggests. As one publication entered as an exhibit by Harrell during Dr. Ofshe's testimony puts it: "The reasons why false confessions occur are multifaceted (*i.e.*, they are usually due to a combination of factors rather than one single factor acting in isolation. They are the outcome of a dynamic and interactive social process)." *Id.* at Ex. F (Daniel Lassiter and Christian A. Meissner, *Police Interrogations and False Confessions* 31 (2010) (Chapter 2, Gisli H. Gudjonsson, *The Psychology of False Confessions: A review of the Current Evidence, at 32)).*

Applying the *Frye* standard, it was not the trial court's function to critique the reliability of Dr. Ofshe's methodology, or to choose a side in the scholarly debate between Dr. Ofshe and Mr. Cassell. Instead, in my view, the trial court's sole focus should have been on determining whether or not Dr. Ofshe's methodology in reaching his conclusions "has general acceptance in the relevant scientific community." *Grady,* 576 Pa. at 555, 839 A.2d at 1044. As our Supreme Court clearly instructed in *Grady,* trial judges should make no independent determination regarding the trustworthiness of the methodology of the proffered expert. *Id.* at 557, 839 A.2d at 1044–45. Instead, that determination must be made by the *scientists* in the relevant field by and through their general acceptance or rejection of the challenged methodology. *Id.*

In my view, the trial court erred in two fundamental respects. First, to the extent that the trial court focused on the general acceptance test at all, it looked to the wrong field of scientists to make that determination. The Supreme Court's decision in *Grady* plainly indicates that the general acceptance of the proffered expert's methodology must be in the "*relevant* scientific community." *Id.* at 555, 839 A.2d at 1044 (emphasis added). In this case, the *relevant* scientific community is that of scientists in the field of social psychology. The trial court, with its focus on the testing of hypotheses and the lack of a theory of causation to establish accurate frequency rates, applied far more general scientific precepts commonly associated with the physical (or "hard") sciences.

Second, in its criticism of Dr. Ofshe's methodology, the trial court did not review the evidence of record to determine whether they are generally accepted in the field of social psychology. Based upon my review of the record on appeal, there is

7. Dr. Ofshe cited to a study by the Innocence Project of roughly 250 cases where the use of DNA evidence had exonerated defendants of crimes for which they had been convicted. Approximately 24 percent of those wrongly convicted individuals had given a false confession. N.T., 9/20/10, at 38–39.

overwhelming evidence that Dr. Ofshe's methodology is generally accepted among social psychologists, especially those likewise involved in the study of false confessions. Dr. Ofshe testified that his methodology is entirely "standard" among social psychologists studying false confessions. N.T., 9/20/10, at 52–53; *see Trach*, 817 A.2d at 1114 (an expert may testify regarding general acceptance of his/her own methodologies). Dr. Ofshe has published peer-reviewed articles on the topic of how police interrogation tactics may elicit false confessions, N.T., 9/20/10, at 18; R.J. Ofshe, & R.A. Leo, *The Social Psychology of Police Interrogation. The Theory and Classification of True and False Confessions*, Studies in Law, Politics, and Society (1997); R.J. Ofshe, & R.A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, DENV. L.REV. 74, 979 (1997).

These publications have been cited by other social psychologists. *See, e.g.*, N.T., 9/20/10, at Ex. G (Saul M. Kassin, *The Psychology of Confessions*, Annual Review of Law and Social Science, 193, 194 (2008)). One 2009 publication explains that "[t]wo broad methods have been employed to study the impact of interrogation techniques: field/archival research and laboratory research," and cites to Dr. Ofshe's work as a principal example of the first type. N.T., 9/20/10, at Ex. H (J.L. Skeem, K.S. Douglas and S.O. Lillienfeld, *Psychological Science in the Courtroom* (Chapter 6, A.D. Redlich & C.A. Meissner, *Techniques and Controversies in the Interroga-*

*tion of Suspects*, 131 (2009))). Another recognized expert in the field, Dr. Gisli Gudjonsson of the University of London, recognized that Dr. Ofshe's "important work" has helped to provide "a framework for understanding and researching the psychological processes involved." N.T., 9/20/10, at Ex. F (Daniel Lassiter and Christian A. Meissner, *Police Interrogations and False Confessions* 31 (2010) (Gisli H. Gudjonsson, *The Psychology of False Confessions: A review of the Current Evidence, at 31)).

In significant contrast, the record on appeal contains very little evidence that Dr. Ofshe's methodologies are not generally accepted among social psychologists. The Commonwealth's evidence on this point is generally limited to the testimony of Mr. Cassell, who has a law degree but no formal training in either psychology or sociology. N.T., 9/29/10, at 26. Mr. Cassell is clearly of the view that Dr. Ofshe's methodologies are not generally accepted, an opinion based firmly in his belief regarding the lack of empirical research regarding the frequency rate that false confessions occur (which Dr. Ofshe does not dispute). *Id.* at 46. Other than himself and his own publications, however, Mr. Cassell did not introduce any publication by any social psychologist expressing any disagreement with Dr. Ofshe's methodologies;[8] and again, we note that Mr. Cassell is neither a trained psychologist or sociologist.

In sum, Mr. Cassell's testimony, without more, provides little evidence of any lack

---

8. Mr. Cassell does cite to the recognition by three researchers regarding the lack of empirical studies on the frequency of false confessions and the need for more research in this and other related areas. *Id.* at 58–59 (citing to Professors Welsh White and Saul Kassin and Major James Agar). None of these publications are included in the certified record on appeal. Moreover, agreement with Mr. Cassell on the issue of the lack of frequency rates does not constitute a refutation of Dr. Ofshe's methodologies. For example, Professor Kassin cited with approval and discussed Dr. Ofshe's "case study method" in a 2008 article. N.T., 9/20/10, at Ex. G (Saul M. Kassin, *The Psychology of Confessions*, Annual Review of Law and Social Science, 193, 196 (2008)).

of general acceptance of Dr. Ofshe's methodologies in the relevant scientific community of social psychologists. In my view, Harrell's evidence demonstrates overwhelmingly to the contrary. As a result, I would find that the trial court erred in denying Harrell's motion *in limine* and should have permitted Dr. Ofshe to testify at trial. The trial court's error should result in a new trial for Harrell.

As I would reverse the trial court's judgment of sentence on this basis, it is not necessary to decide the other issues raised in Harrell's appeal. I write briefly, however, to address the first issue Harrell presents on appeal, namely whether the police's failure to record his interrogation and confession violated his due process rights under the federal[9] and Pennsylvania[10] constitutions. In this regard, Harrell sets forth two distinct arguments. First, Harrell contends that based upon the specific facts presented in his case, the failure of the police to record his interrogation and confession constituted a purposeful and bad faith destruction of exculpatory evidence, violating his rights to due process. Second, Harrell argues more broadly that the due process requires the police to record all interrogations.

In support of the first argument, which the Majority does not address, Harrell cites to *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) and *United States v. Elliott*, 83 F.Supp.2d 637 (E.D.Va.1999). In *Trombetta*, the United States Supreme Court ruled that the failure of arresting officers to preserve breath samples in a drunk driving case did not constitute a violation of the defendant's due process rights. In so ruling, the Supreme Court offered three reasons why due process "did not require law enforcement agencies [to] preserve [evidence] in order to introduce [at trial] the results of ... tests" conducted on that evidence. *Trombetta*, 467 U.S. at 491, 104 S.Ct. 2528. First, there was no bad faith by the police. *Id.* at 488, 104 S.Ct. 2528; *see also Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). Instead, the police destroyed the physical evidence "in good faith and in accord with their normal practice." *Trombetta*, 467 U.S. at 491, 104 S.Ct. 2528. Second, the evidence in question was not

9. "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1.

10. "In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and in prosecutions by indictment or information,

a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself." PA. CONST. art. I, § 9.

Sometimes referred to as the "law of the land" provision, Article I, Section 9 is the equivalent of the "due process" provisions of the United States Constitution. *Commonwealth v. Chilcote*, 396 Pa.Super. 106, 578 A.2d 429, 434 (1990), *appeal denied*, 527 Pa. 615, 590 A.2d 756 (1991).

"constitutionally material." *Id.* at 489, 104 S.Ct. 2528. In other words, the evidence did not possess "an exculpatory value that was apparent before the evidence was destroyed" and which was of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* Third, the likelihood that the destroyed evidence would have been exculpatory was small. *Id.*

In *Elliott*, the federal district court for the Eastern District of Virginia found a violation of the defendant's due process rights through application of *Trombetta*'s principles for the destruction of evidence. The Drug Enforcement Agency (DEA) received notification of the arrest of Elliott, who was suspected of *(inter alia)* the manufacture of methamphetamine, after a traffic stop in a vehicle that contained laboratory glassware, tubing, chemicals, plastic gloves, and filters. *Elliott*, 83 F.Supp.2d at 640. The DEA agent, who saw the residue of an unidentified substance on the glassware, had the seized evidence tested for fingerprints and then destroyed. *Id.* Applying *Trombetta*, the federal court ruled that the destruction of the evidence was done in bad faith, since "any reasonable enforcement agent" would recognize its potentially exculpatory value, including the possibility that testing could show that the residue on the glassware was not methamphetamine or its chemical constituents. *Id.* at 643. As a result, the federal court suppressed the use of the fingerprint evidence at trial. *Id.* at 649.

In the present case, Harrell claims that his confession should have been suppressed based upon the same principles as applied in *Elliott*. Harrell's Brief at 23. Harrell argues that after hours of shackled interrogation and food and sleep deprivation, the police were able to coerce a false confession from him. *Id.* According to

Harrell, the police knew the exculpatory value of a recording of the interrogation and confession, and chose not to record in bad faith. *Id.* A recording "would have provided, among other things, the entire circumstances of the police questioning, length of interrogation, tactics employed, claims about existing evidence, express or implied promises, whether the confession was actually his or simply an acceptance of police suggestions, who was responsible for stating key facts, and the context of the statements made." *Id.* at 24–25. The failure of the police to record the entire interrogation process "smacks of bad faith," according to Harrell, because recording equipment was available at all times, yet the police did not seek to record an interview with Harrell until after the interrogation had produced a false confession. *Id.* at 25.

In my view, the *Trombetta–Youngblood–Elliott* line of cases does not have any application to this case. That line of cases stands for the proposition that the police may not destroy existing physical evidence in bad faith. The issue raised by Harrell, however, does not involve any question of the failure to preserve existing evidence (in bad faith or otherwise), but rather whether due process requires the police to *create new evidence.* A recording of Harrell's interrogation and confession would have been the creation of new evidence in the case, not the destruction of existing evidence. The *Trombetta–Youngblood–Elliott* line of cases does not require the police to create new evidence.

For his second argument, Harrell argues that constitutional due process should require the police to record all interrogations as a matter of regular course. Harrell cites to *Stephan v. State,* 711 P.2d 1156, 1164–65 (Alaska 1985), in which the Supreme Court of Alaska held the due process clause of the Alaska Constitution

provides a criminal suspect in that state with a right to have his or her interrogation electronically recorded. In *Stephan,* the Supreme Court of Alaska predicated its holding on the belief that "recording ... is now a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self-incrimination and, ultimately, his right to a fair trial." *Id.* at 1159–60.

This is a question of first impression in the Commonwealth. This Court was presented with a similar issue in *Commonwealth v. Craft,* 447 Pa.Super. 371, 669 A.2d 394 (1995),[11] but the view of then-President Judge Del Sole, that Pennsylvania's due process clause does not require recordation, did not garner a second vote so as to constitute a majority view of the three-judge panel. *Id.* at 398. Judge Del Sole's view was that based upon *Trombetta* and state court decisions following its guidance,[12] the due process clause in the Pennsylvania Constitution (Article I, Section 9) does not compel a result in accord with the Alaska Supreme Court's in *Stephan. Id.* at 397. According to Judge Del Sole, "[t]he rule regarding breathalyzers controls the issue of recordation." *Id.*

In the present case, the Majority acknowledges that *Craft* has no precedential value, but indicates that it finds Judge Del Sole's reasoning persuasive and thus adopts it in rejecting Harrell's second argument. I disagree with the decision to do so for two reasons. First, as indicated hereinabove, in my view, *Trombetta* has no application to the issue of the recordation of interrogations, as that case involves the preservation of existing evidence rather than the creation of new evidence. Second, Judge Del Sole's single judge decision in *Craft* is now nearly 18 years old, and neither party in this case briefed any issues related to its continued viability and application (including no analysis of cases decided under Article I, Section 9 since 1995). I would instead reject Harrell's second argument based upon waiver, given his failure to develop it with either detailed argument or citation to relevant authorities. *See, e.g., Commonwealth v. Palo,* 24 A.3d 1050, 1058 (Pa.Super.), *appeal denied,* 613 Pa. 663, 34 A.3d 828 (2011).

While disagreeing with its rationale, I agree with the Majority's result on this issue, as a policy-based decision to compel recordation of all police interrogations is a step that we, as an intermediate appellate court, cannot take. Our legislature and our Supreme Court are empowered to do so. Those states that have so addressed the issue have fashioned approaches to inject some transparency into the custodial interrogation process. This seems eminently reasonable since recordation protects the police from charges of abusive and coercive interrogations that violate a defendants' rights, and provides an innocent accused with recourse when coerced into a false confession.

The highest courts of sister states have adopted various remedies for addressing

---

**11.** The issue presented in *Craft* was "whether Article I, Section 9 of the Constitution of the Commonwealth of Pennsylvania requires that confessions obtained while the defendant is in a custodial setting be memorialized, in their entirety, by a writing signed by the defendant or by audio recording." *Craft,* 669 A.2d at 394. In this case, Harrell argues that the police must make either a video or audio recording. Harrell's Brief at 24.

**12.** Following *Trombetta,* in *Commonwealth v. Gamber,* 352 Pa.Super. 36, 506 A.2d 1324, 1327–28 (1986) and *Commonwealth v. Tillia,* 359 Pa.Super. 302, 518 A.2d 1246, 1250–52 (1986), this Court held that the Commonwealth's failure to preserve breath samples used in blood alcohol level tests did not violate the defendant's due process rights under the Pennsylvania Constitution.

the issue. For example, the Supreme Court of Minnesota adopted a recordation requirement on non-constitutional grounds. *State v. Scales*, 518 N.W.2d 587, 591–92 (Minn.1994) (requiring recordation "in the exercise of our supervisory power to insure the fair administration of justice"). The Supreme Court of Wisconsin similarly imposed a recordation obligation based upon its supervisory powers, although limited its holding to juvenile cases. *In re Jerrell C.J.*, 283 Wis.2d 145, 699 N.W.2d 110, 121 (2005) ("Experiences in Minnesota, Alaska, and hundreds of other jurisdictions that now voluntarily record demonstrate that the benefits of such practice greatly outweigh the costs, both real and perceived.").

Wisconsin's legislature subsequently expanded the recordation requirement by statute to apply to all cases. W.S.A. 968.073(2) ("It is the policy of this state to make an audio or audio and visual recording of a custodial interrogation of a person suspected of committing a felony unless a condition under [§ 972.115(2)(a)1–6] applies or good cause is shown for not making an audio or audio and visual recording of the interrogation."). Other states have passed similar legislation. *See, e.g.,* 725 Ill. Comp. Stat. Ann. 5/103–2.1; Me.Rev. Stat. Ann. tit. 25, § 2803–B(1)(J); 2004 Me. Legis. Serv. 780; Tex.Code Crim. Proc. Ann. art. 38.22, § 3.

The Supreme Court of New Jersey has exercised its supervisory powers to establish a court rule requiring recordation of interrogations for all serious crimes. N.J. Court Rules 3:17(a). Pursuant to this court rule, a failure to record an interrogation, absent a recognized exception, entitles the criminal defendant to a cautionary instruction to the jury at trial. *Id.* at 3:17(e). The Supreme Judicial Court of Massachusetts has also held that a criminal defendant is entitled to a cautionary jury instruction in the absence of the introduction of a recorded interrogation by the prosecution. *Commonwealth v. DiGiambattista*, 442 Mass. 423, 813 N.E.2d 516, 534 (2004) ("Where voluntariness is a live issue and the humane practice instruction is given, the jury should also be advised that the absence of a recording permits (but does not compel) them to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt.").

When available, a criminal defendant's confession is usually the most important evidence to be introduced in a trial. As such, the finder of fact should have a recording of the interrogation that produced it in order to analyze and consider its precise contents and any coercive influences that may have elicited the confession. Instead, finders of fact in Pennsylvania today are too often provided with only the testimony of police officers and the defendant's resulting confession (and perhaps his/her equally biased testimony of the same interrogation). The failure to require recordation means that the finder of fact at trial is presented with what is at best an incomplete and unreliable version of critical evidence likely to be dispositive of the determination of guilt. This is an unnecessary evidentiary void that deserves the attention of the Pennsylvania Supreme Court or our legislature.

For these reasons, I respectfully dissent.