J-S31023-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LESTER LERINGO JOHNSON | |
| Appellant | No. 888 MDA 2015 |

Appeal from the Judgment of Sentence April 20, 2015
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s): CP-36-CR-0001084-2013

BEFORE:  SHOGAN, J., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.:                            **FILED JULY 26, 2016**

Lester Leringo Johnson appeals from the judgment of sentence imposed on April 20, 2015, in the Court of Common Pleas of Lancaster County.  Johnson was found guilty in a non-jury trial of one count of criminal homicide-murder in the third degree, three counts of endangering the welfare of children (EWOC), and two counts of aggravated assault.[1]  The trial court sentenced Johnson to an aggregate term of 22 to 44 year's incarceration.[2]  Johnson contends (1) the trial court erred in denying his

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c), 4304(a)(1), and 2702(a)(1), respectively.

[2] The trial court imposed a sentence of incarceration of 20 to 40 years on the the third degree murder charge (Count One), and imposed concurrent sentences of incarceration of one year to two years on the EWOC charges at Counts Two and Three, and of two years to four years on the EWOC charge
*(Footnote Continued Next Page)*

suppression motion "where [his] statement became involuntary at the point when police responded to his request to use the restroom by asking him to wait, in order to coerce a confession from him," and (2) the trial court "illegally impose[d] sentences for Counts Two and Three of the Information, for two first degree misdemeanor charges of [EWOC], where these two charges should have merged with Count Four, the third degree felony charge of [EWOC]." Johnson's Brief at 5. Based upon the following, we affirm in part and vacate in part.

The events that occurred prior to Johnson's arrest were summarized by the trial court, as follows:

> On January 12, 2013, at approximately 3:27 in the morning, R.K., the two-year–old daughter of [Johnson]'s paramour, Jessica Bachman, was taken by ambulance to Lancaster General Hospital where she subsequently passed away.
>
> At approximately 3:53 the same morning, Officer David Hershiser and Officer Justin Miller of the Lancaster City Police arrived at [] Street to monitor the home where [Johnson], Ms. Bachman, and four children, including R.K., resided. Officer Hershiser "understood there was a young girl that was taken to the hospital that was sick." On at least one occasion, while engaged in casual conversation with [Johnson], Officer Hershiser asked [Johnson] what had happened to R.K. Officer Hershiser left [] Street at approximately 6:00 a.m. At that point, the officers at the home did not know that R.K. had died or that a crime had been committed, and [Johnson] was not considered a suspect.

(Footnote Continued) ─────────────

at Count Four, which were all made to run consecutively to the sentence imposed on Count One. The aggravated assault charges merged for sentencing purposes. *See* N.T., 4/20/2015, at 24–25.

Officer Andrew Nauman of the Lancaster City Police arrived at the residence at approximately 6:00 a.m. At 7:15 a.m., Nancy Elaabar, the grandmother of two of the children in the house, arrived at the residence and informed [Johnson] that R.K. had passed away. [Johnson] became upset and agitated. [Johnson's] movement was not restricted by the officers at any point during this time.

At 8:20 a.m., Lieutenant Michael Winters and Detective Gareth Lowe arrived at the home. Detective Lowe introduced himself to [Johnson] and explained he would like to speak to [Johnson] about any information he may have surrounding the circumstances of R.K.'s death. [Johnson] agreed to go to the police station with Detective Lowe and Lieutenant Winters to speak with them about what had happened to R.K. Detective Lowe gave [Johnson] a ride to the station.

At the station, [Johnson] signed the visitor log, and Detective Lowe and Lieutenant Winters accompanied him to the public elevator, where they went to the third floor. Detective Lowe showed [Johnson] where the restrooms were and explained that they would be going to the secure side of the floor. Detective Lowe also explained to [Johnson] how he could get back to the public area from the interview room in the secure area. [Johnson] asked for a cup of coffee, which Detective Lowe provided, and Detective Lowe explained that the interview would be recorded. [Johnson] indicated he understood he was free to leave at any time and that he had given consent to have the interview recorded. [Johnson] was not given any ***Miranda*** [***Miranda v. Arizona***, 384 U.S. 436 (1966)] warnings on January 12, 2013.

The January 12, 2013, interview lasted approximately an hour and a half. At approximately 10:15 a.m., while the detectives were in the hallway, [Johnson] opened the door and asked how much longer the interview would last and indicated he would like to go home. After a short conversation, [Johnson] agreed to let the detectives confer to find out if they had obtained all necessary information. Detective Lowe asked [Johnson] if he had been treated fairly and asked if he could speak with [Johnson] again. [Johnson] answered both questions "yes." At that point, the detectives and [Johnson] exchanged contact information and set up another interview for a few days

later. Detective Lowe then drove [Johnson] home. [Johnson] was not placed under arrest on January 12, 2013.

On January 14, 2013, Detective Lowe called Ms. Bachman to speak to her about coming back to the police station to speak with the detectives. Ms. Bachman agreed to come to the police station with [Johnson] and Ms. Elaabar. Ms. Bachman, [Johnson] and Ms. Elaabar arrived at the police station on their own at approximately 3:45 in the afternoon and all three signed the visitor log. Detective Lowe asked the three if they would be willing to come to the third floor of the station, and they said they would. Detective Lowe then took them on the public elevator to the third floor and explained that they would be taken to the public waiting room until someone came to talk to them in the secure area of the building. Lieutenant Winters and Detective Randall Zook walked with [Johnson] to the secure area of the building to a different interview room than the one used on January 12, but in the same section of the violent crime and property crime division. As was the case on January 12, 2013, [Johnson] consented to having the interview recorded. Lieutenant Winters explained to [Johnson]:

> we didn't get to finish talking to you and I wanted to finish just to ask you some other stuff just to kind a [sic] follow up with what we discussed the other day.... there's a little concern about some of the injuries just ... and like how [R.K.] was feeling and stuff before all this happened on Friday. And just because of that they ... they want us to cover all of our bases with you and one of the things that we have to do is advise you of or [sic] rights, okay.

Lieutenant Winters asked [Johnson] about his background, including his name, date of birth and education. [Johnson] was then given his *Miranda* warnings, prompting him to ask if he was being charged with a crime. Lieutenant Winters stated it did not and that the detectives needed to gather more information. The detectives reviewed the *Miranda* rights form with [Johnson] explaining his constitutional rights, and [Johnson] signed the form indicating he understood his rights and was willing to speak to the detectives. [Johnson] also stated that he understood he was free to stop answering questions at any time and that no threats or promises were made to him. [Johnson] was responsive to all of the detectives' questions and did not engage in any bizarre behaviors during the interview. [Johnson] did not

appear to be under the influence of alcohol or a controlled substance.

[Johnson] was interviewed for approximately two hours and fifteen minutes. At approximately 6:00 p.m., Detective Zook and Lieutenant Winters left the room to confer with other officers. Before leaving, Lieutenant Winters asked [Johnson] if he wanted a cigarette, something to drink, or anything else. [Johnson] asked for a soda. At no time before or during the break did [Johnson] state he needed to use the restroom, nor did he get up and attempt to leave the interview room.

Approximately 10 minutes later, the detectives returned, gave [Johnson] a soda and resumed the interview. Lieutenant Winters told [Johnson] he did not believe R.K.'s death was accidental and that Ms. Bachman had stated that [Johnson] had inflicted the injuries.

> [W]e started to be a little more direct about the interview with the questions and [[Johnson's]] body language started to change. He put his head down and put his hands over his face. And I started to ask some questions about the - that we needed to know what really happened. As his body language changed he started to breathe differently and his breathing got much deeper and he would exhale and his chest would kind of quiver when he exhaled and it indicated to me he was kind of stressed and upset. We were in the interview for less than five minutes at this point and he start [sic] to speak real quietly. He began to get more emotional without saying anything, but I could tell physically he appeared more emotional. At some point he whispered, I would like to use the bathroom or I need to use the bathroom.
>
> And my response was, could you give me five more minutes? We really need to know what happened.

(N.T., January 29, 2014, 45–46 (testimony of Lieutenant Winters)). [Johnson] asked once again to use the bathroom, and Lieutenant Winters again asked for five more minutes. [Johnson] then made several inculpatory statements, admitting he struck R.K. several times in the head and stomach the day before her death.

At approximately 6:38 p.m., detectives took another break and escorted [Johnson] to the bathroom. At 7:00 p.m., the interview concluded and [Johnson] was placed under arrest.

Trial Court Opinion, 6/24/2014, at 1–7 (most record citations omitted) (footnotes omitted).

On March 19, 2015, Johnson was found guilty by the trial judge of the above-stated charges, and, following sentencing, this appeal followed.[3]

Johnson first contends that the trial court erred in denying his suppression motion because his statement became involuntary at the point when police told him to wait in response to his request to use the bathroom.

The principles that guide our review are well settled:

In reviewing a suppression court's denial of a suppression motion,

> we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Jones*, 605 Pa. 188, 988 A.2d 649, 654 (Pa. 2010) (citing *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 842 (Pa. 2003)). Nonetheless, we exercise plenary review over the suppression court's conclusions of law. *Id*. (citations omitted).

*Commonwealth v. Johnson*, 107 A.3d 52, 93 (Pa. 2014).

---

[3] Johnson, having been granted an extension of time to file a Pa.R.A.P. 1925(b) statement, timely filed his concise statement on June 17, 2015.

When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. Voluntariness is determined from the totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.

*Commonwealth v. Nester,* 551 Pa. 157, 162-163, 709 A.2d 879, 882 (1998) (citations and footnote omitted).

When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

*Id.* at 164, 709 A.2d at 882 (citations omitted). "The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review." *Commonwealth v. Templin,* 568 Pa. 306, 310, 795 A.2d 959, 961 (2002), citing *Nester, supra.*

*Commonwealth v. Harrell*, 65 A.3d 420, 434 (Pa. Super. 2013).

In this case, the trial court opined:

[Johnson], Ms. Bachman and Ms. Elaabar came to the police station on their own on the afternoon of January 14, 2013. (N.T., January 29, 2014, 57). The detectives were dressed in suits, and [Johnson] was not frisked or forced to go into the interview room. (*Id*. at 30-31, 34-35). [Johnson] did not appear to be under the influence of drugs or alcohol or sleep deprived. (*Id*. at 33-34). At all times prior to making the inculpatory statements, [Johnson] was treated as a visitor and was free to leave at any time. Lieutenant Winters explained to [Johnson] that they were going to an interview room "much like [they] did

the other day [January 12]," when it was explained to [Johnson] he was free to leave at any point. (*Id*. at 65). Before the detectives asked [Johnson] any questions, Lieutenant Winters went over his ***Miranda*** warnings with [Johnson] and told him he was free to stop answering questions at any time he wished. (Commw. Ex. 7, p. 3). [Johnson] indicated he understood this. (*Id*.).

When the detectives took a break at approximately 6:00 p.m., Lieutenant Winters asked [Johnson] if he could get [Johnson] "anything, a cigarette, something to drink? You sure you want a soda or some water or anything?" (*Id*. at pp. 79-80). [Johnson] never indicated he needed to use the restroom, nor did he get up to leave the interview room while the officers were taking a break as he had done two days earlier.

When the interview resumed, Lieutenant Winters repeatedly asked [Johnson] what had happened to R.K. and if [Johnson] had done something to R.K. that he "wish[ed] [he] could take back." (*Id*. at 80-82). While [Johnson] remained silent, he placed his head in his hands and began to get emotional. (*See* Commw. Ex. 8 (recording of the January 14, 2013, interview)). After [Johnson] asked to go to the bathroom the first time, Lieutenant Winters stated:

> Can you...can you just give me five-minutes. Can you just give me five-minutes. I'm...I'm I need to know I'm...I'm just I don't understand I need to know. What happened?
>
> [Defendant]: Can I use the bathroom? I tell you when I get back I promise.
>
> [Lieutenant Winters]: Lester can you give me five-minutes. We can't help you if you don't tell us man this is gonna eat you up. Help us understand. What happened?

(Commw. Ex, 7, p. 82). At that point, [Johnson] made the inculpatory statements. [Johnson's] request to use the bathroom was never refused, and at no point did he stand up, walk around and open the door as he had done in the January 12, 2013, interview or wet himself. (N.T., January 29, 2014, 47). At the beginning of the interview, it was explained to [Johnson] that he was free to stop answering questions at any time he wished.

[Johnson] did not indicate he wished to stop answering the detectives' questions until he used the bathroom, but instead he continued to speak with them and made the inculpatory statements.

[Johnson] maintains that because the detectives continued to tell him they did not believe him and kept asking [Johnson] what had happened, the questioning was coercive. This argument is without merit. "Repeatedly asking an accused to be truthful without implying or making direct promises or threats to the person does not result in a coerced confession." [**Commonwealth v.**] **Rushing**, 71 A.3d 939, 954 [(Pa. Super. 2014)]. The record is devoid of any evidence that Lieutenant Winters or Detective Zook threatened [Johnson] or made any promises to him during the January 14, 2013, interview. "Encouraging a suspect to cooperate with the investigation and answer questions honestly is a permissible interrogation tactic." **Nester**, at 167, 70.9 A.2d at 884.

[Johnson] has a ninth grade education, but completed his GED in 2006. (Commw. Ex. 7, p. 2). [Johnson's] answers to the detectives' questions were responsive, and he reviewed his **Miranda** rights with detectives and signed the form indicating he understood his rights. There is no evidence that either of the detectives acted inappropriately or in a threatening manner. [Johnson] was offered a drink, which he accepted, and a break to smoke, which he refused. [Johnson] was free to use the bathroom during the break, but chose not to do so. (N.T., January 29, 2014, 89-90). There was no evidence that [Johnson] was not of sound mind when he waived his **Miranda** rights and spoke with the detectives. Additionally, there is nothing in the record indicating [Johnson] was psychologically unable to deal with the accusatory statements made by the police.

After analyzing the factors set forth in **Harrell**, 65 A.3d 420, 434-35 (Pa. Super. 2013) (citing **Nester**, 551 Pa. at 164, 709 A.2d at 882), and considering the totality of the circumstances, the Court concludes that [Johnson's] confession was knowing and voluntary.

Trial Court Opinion, 6/24/2014, at 8–11.

We have carefully reviewed the notes of testimony of the suppression hearing and the recordings of the January 12, 2013 and January 14, 2013, police interviews. Contrary to the argument of Johnson, we find the trial court properly ruled that the officers' continued questioning after he requested a bathroom break was not so unduly coercive as to give rise to an involuntary confession. As the trial court discussed, Johnson's request to use the bathroom was never refused or denied, Johnson did not indicate that he wanted to stop answering questions until he used the bathroom, and the officers' manner was not inappropriate or threatening. The trial court's analysis properly considered the totality of the circumstances, and the record supports the court's conclusion that Johnson's confession was voluntary. Accordingly, Johnson's argument that the trial court erred in denying the suppression motion fails.

In the second argument raised by Johnson he asserts the trial court erred in failing to merge the three EWOC counts set forth at Counts Two and Three into the EWOC count set forth at Count Four. As already stated, Johnson was charged with three counts of EWOC under 18 Pa.C.S. § 4304(a)(1). Johnson contends all of the actions charged in Counts Two and

Three were included in the "course of conduct" allegation in Count Four, and therefore, Counts Two and Three should have merged into Count Four.[4]

"Whether Appellant's convictions merge for sentencing is a question implicating the legality of Appellant's sentence. Consequently, our standard of review is *de novo* and the scope of our review is plenary." ***Commonwealth v. Baldwin***, 985 A.2d 830, 833 (Pa. 2009).

Pennsylvania's merger doctrine is codified at Section 9765 of the Sentencing Code, as follows:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

Regarding EWOC, the Crimes Codes provides:

(a) Offense defined.

> (1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

---

[4] In making this argument, Johnson's counsel notes that "sentences for all three counts of endangering welfare of children were imposed concurrently." Johnson's Brief, at 22.

- 11 -

…

(b) Grading. ─ An offense under this section constitutes a misdemeanor of the first degree. However, where there is a course of conduct of endangering the welfare of a child, the offense constitutes a felony of the third degree.

18 Pa.C.S. § 4304. "In order to be graded as a third degree felony, the Commonwealth must allege in the information and present evidence at trial of the additional factor of 'course of conduct'." **Commonwealth v. Popow**, 844 A.2d 13, 17 (Pa. Super. 2004).

The criminal information, which we have redacted, read, in relevant part:

**Count 2 – Endangering Welfare of Children –
Parent/Guardian/Other Commits Offense – (M1)**

Offense Date:  1/11/13   **18 [Pa.C.S.] § 4304 §§ A1**

… TO WIT:  Actor, while in the role of supervising the welfare of [R.K.], DOB: [] knowingly endangered the welfare of [R.K.] by striking her on the head with a closed fist on 1/11/2013 at [] Street, Lancaster, PA.  This act caused traumatic injury to [R.K.'s] right eye, which included retinoschesis, blindness, retinal hemorrahing, and brain injury.  Said offense occurred at [] Street, Lancaster City, Lancaster County, PA.

**Count 3 – Endangering Welfare of Children –
Parent/Guardian/Other Commits Offense – (M1)**

Offense Date:  1/11/13   **18 [Pa.C.S.] § 4304 §§ A1**

… TO WIT:  Actor, while in the role of supervising the welfare of [R.K.], DOB: [] knowingly endangered the welfare of [R.K.] by kicking her on the abdomen with his foot repeatedly on 1/11/2013 at [] St., Lancaster, PA.  This act caused traumatic injury to [R.K.'s] abdomen and internal organs to include the

large bowel, pancreas, and mesentery root. Said offense occurred at [] Street, [Lancaster City,] Lancaster County, PA.

**Count 4 – Endangering Welfare of Children – Parent/Guardian/Other Commits Offense – (F3)**

Offense Date: 1/11/13  **18 [Pa.C.S.] § 4304 §§ A1**

… TO WIT:  Actor, while in his role of supervising the welfare of [R.K], DOB:[] knowingly endangered the welfare of [R.K.] by striking her on the head with a closed fist and kicking her on the abdomen three (3) times on 1/11/2013 at []St., Lancaster, PA. These acts caused traumatic injury to [R.K.'s] right eye, abdomen, brain, and underlying organs resulting in her death on January 12, 2013.  Actor did not seek any medical attention/treatment for [R.K.] between approx. 0800 hours 1/11/13 – 0310 hours, 1/12/13. Said offense occurred at [] Street, [Lancaster City,] Lancaster County, PA.

Criminal Information, 3/15/203, at 1.

Johnson asserts that "because all three acts, as charged, were needed to constitute felony three endangering welfare of children, the misdemeanor counts, which each included one of the three acts which together comprised the course of conduct, necessarily should have merged with the felony count."  Johnson's Brief, at 22.  We disagree with Johnson's premise that Counts Two and Three merge with Count Four.  However, we conclude that Counts Two and Three should have merged for sentencing purposes.

Count Four alleges a "course of conduct" by stating that Johnson "did not seek any medical attention/treatment for [R.K.] between approx. 0800 hours 1/11/13–0310 hours, 1/12/13," after "striking R.K. on the head with a closed fist" and "kicking her on the abdomen with his foot repeatedly." Count Four was charged for Johnson's failure to seek medical treatment for

- 13 -

R.K. over the nighttime hours and early morning hours of January 11 to January 12, 2013. We are satisfied that the Count Four EWOC charge is for criminal conduct separate and distinct from the Count Two EWOC charge for striking R.K. on the head with a closed fist, and the Count Three EWOC charge for kicking R.K. on the abdomen repeatedly.

We note, however, that although Counts Two and Three set forth different facts, these EWOC charges both arose out of a single criminal act, and the statutory elements of offense are the same. Specifically, Johnson confessed that he "[j]ust lost my cool and I hit her upside the head. And she fell. And I kicked her in the stomach." Commonwealth Exhibit 7, at 83. Therefore, we find that the sentences for Count Two and Count Three should merge, being that the second condition for merger, that "all of the statutory elements of one offense are included in the statutory elements of the other offense[,]" is met. As we conclude the merger doctrine does apply to Counts Two and Three, we vacate the sentence imposed on Count Three. Nonetheless, there is no need to remand for resentencing, since the court imposed concurrent sentences on Counts Two, Three and Four.

Judgment of sentence affirmed in part, vacated in part as to Count Three. Jurisdiction relinquished.

Judge Strassburger joins this Memorandum.

Judge Shogan files a Concurring and Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/26/2016</u>